UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CYNTHIA A. BELECZ,<br><br>     Petitioner,<br><br> v.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security<br>Administration,<br><br>    Respondent. | Case No. 1:16-cv-00398-CWD<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

## INTRODUCTION

Currently pending before the Court is Cynthia Belecz's Petition for Review of the

Respondent's denial of social security benefits, filed on September 2, 2016. (Dkt. 1.) The

Court has reviewed the Petition for Review and the Answer, the parties' memoranda, and

the administrative record (AR), and for the reasons that follow, will remand the decision

of the Commissioner.

**MEMORANDUM DECISION AND ORDER - 1**

## PROCEDURAL AND FACTUAL HISTORY

Petitioner filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433, on July 22, 2013. This application was denied initially and on reconsideration, and a hearing was conducted on January 13, 2015, before Administrative Law Judge (ALJ) Luke Brennan. After considering testimony from Petitioner and a vocational expert, ALJ Brennan issued a decision on February 27, 2015, finding Petitioner not disabled. Petitioner timely requested review by the Appeals Council, which denied her request for review on July 29, 2016.

Petitioner appealed this final decision to the Court. The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. § 405(g).

At the time of the alleged amended disability onset date of August 19, 2013, Petitioner was fifty-six years of age. Petitioner obtained an Associate's degree in liberal arts, and a Bachelor of Science degree in forestry. Her past relevant work experience includes work as an accounting clerk and an escrow clerk.

## SEQUENTIAL PROCESS

The Commissioner follows a five-step sequential evaluation for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. At step one, it must be determined whether the claimant is engaged in substantial gainful activity. The ALJ found Petitioner had not engaged in substantial gainful activity since her alleged onset date of August 19, 2013. At step two, it must be determined whether the claimant suffers

from a severe impairment. The ALJ found Petitioner's fibromyalgia severe within the meaning of the Regulations.

Step three asks whether a claimant's impairments meet or equal a listed impairment. The ALJ found that Petitioner's fibromyalgia did not meet or equal the criteria for any listed impairment. The ALJ did not identify which listing he considered. (AR 15.) If a claimant's impairments do not meet or equal a listing, the Commissioner must assess the claimant's residual functional capacity (RFC) and then determine, at step four, whether the claimant has demonstrated an inability to perform past relevant work.

The ALJ determined Petitioner retained the RFC to perform sedentary work as defined by 20 C.F.R. § 404.1567(a), with limitations. He found she could lift and carry ten pounds occasionally, and less than ten pounds frequently; stand and/or walk for six out of eight hours; sit for six out of eight hours; frequently climb ramps and stairs, but never climb ropes, ladders and scaffolds; and frequently balance, stoop, kneel, crouch, and crawl.

In determining Petitioner's RFC, the ALJ found that Petitioner's impairments could reasonably be expected to cause the symptoms she alleged, but that her statements about the intensity, persistence, and limiting effects of her conditions were not entirely consistent with the medical evidence, her treatment history, and her daily activities. (AR 16-17.) First, the ALJ determined that the objective medical evidence, such as examination findings revealing normal gait, strength, sensation, and range of motion, did not support the level of impairment Petitioner claimed. Second, the ALJ discredited

Petitioner because she did not seek out more invasive treatment for her condition, such as trigger point injections. (AR 17.) And finally, the ALJ noted Petitioner's daily activities could not be objectively verified; she engaged in part time work; and the medical evidence of her level of impairment was weak. (AR 17.)

Next, the ALJ considered the opinions of Petitioner's treating providers, Dr. Ashley Davis; Dr. Robert Friedman; Dr. Monika Fealko; and Ashley Robinson, LCSW. The ALJ found that a review of the medical evidence and Petitioner's activities did not support Dr. Friedman's medical source statement limiting Petitioner to sitting for two out of eight hours and standing and walking for less than two out of eight hours, or his opinion that she would miss two days of work each month. (AR 18.) Next, on one hand, the ALJ gave Dr. Davis's November 18, 2013 medical source opinion little weight, while on the other hand, he gave a later opinion of hers dated December 5, 2014, partial weight. (AR 18.) And finally, the ALJ discounted Ashley Robinson's opinions regarding Petitioner's emotional and mental functioning, because Robinson did not explain the opinions, and her opinions did not appear consistent with Petitioner's hobbies and part time work.

Last, the ALJ discredited the lay witness opinions for various reasons, including that, as friends and family, the witnesses were sympathetic to Petitioner; none of them had specialized medical training; her family had a financial interest in a favorable adjudication of Petitioner's application for disability benefits; and, the statements were not consistent with Petitioner's activities and hobbies.

**MEMORANDUM DECISION AND ORDER - 4**

Based upon his evaluation of the record as summarized above, the ALJ found Petitioner was able to perform her past relevant work as either an escrow clerk or an accounting clerk. Because Petitioner did not demonstrate an inability to perform past relevant work, the ALJ did not reach step five. Consequently, the ALJ determined Petitioner was not disabled.

## STANDARD OF REVIEW

Petitioner bears the burden of showing that disability benefits are proper because of the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A); *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971). An individual will be determined to be disabled only if her physical or mental impairments are of such severity that she not only cannot do her previous work but is unable, considering her age, education, and work experience, to engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

On review, the Court is instructed to uphold the decision of the Commissioner if the decision is supported by substantial evidence and is not the product of legal error. 42 U.S.C. § 405(g); *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474 (1951); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (as amended); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla but less than a preponderance, *Jamerson v Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

The Court cannot disturb the Commissioner's findings if they are supported by substantial evidence, even though other evidence may exist that supports the petitioner's claims. 42 U.S.C. § 405(g); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Thus, findings of the Commissioner as to any fact, if supported by substantial evidence, will be conclusive. *Flaten*, 44 F.3d at 1457. It is well-settled that, if there is substantial evidence to support the decision of the Commissioner, the decision must be upheld even when the evidence can reasonably support either affirming or reversing the Commissioner's decision, because the Court "may not substitute [its] judgment for that of the Commissioner." *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999).

When reviewing a case under the substantial evidence standard, the Court may question an ALJ's credibility assessment of a witness's testimony; however, an ALJ's credibility assessment is entitled to great weight, and the ALJ may disregard a claimant's self-serving statements. *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). Where the ALJ makes a careful consideration of subjective complaints but provides adequate reasons for rejecting them, the ALJ's well-settled role as the judge of credibility will be

upheld as based on substantial evidence. *Matthews v. Shalala*, 10 F.3d 678, 679-80 (9th Cir. 1993).

## DISCUSSION

Petitioner argues the ALJ erred at steps three and four of the sequential evaluation. Petitioner asserts the ALJ did not consider whether Petitioner's fibromyalgia medically equaled a listing at step three. Pet. Brief at 8. Next, Petitioner maintains the ALJ improperly evaluated the opinions of her treating providers. Pet. Brief at 11. And last, she contends the ALJ erroneously assessed Petitioner's credibility and did not properly evaluate the lay witness testimony. Pet. Brief at 15. Accordingly, Petitioner argues the ALJ's errors resulted in an inaccurate RFC that failed to account for all her medically determinable impairments and their effect as a whole on her capacity to perform work. Petitioner asks the Court to reverse the ALJ's decision and remand for an award of benefits.

## 1.    Step Three: Meet or Equal a Listing

If the claimant satisfies the criteria under a listing and meets the twelve-month duration requirement, the Commissioner must find the claimant disabled without considering age, education and work experience. 20 C.F.R. § 404.1520(a)(4)(iii), (d). A claimant bears the burden of producing medical evidence that establishes all the requisite medical findings that her impairments meet or equal any particular listing. *Bowen v. Yuckert,* 482 U.S 137, 146, n. 5 (1987). Further, if the claimant is alleging equivalency to a listing, the claimant must proffer a theory, plausible or otherwise, as to how her

combined impairments equal a listing. *See Lewis v. Apfel,* 236 F.3d 503, 514 (9th Cir. 2001).

Fibromyalgia is not a listed impairment. Accordingly, the ALJ must determine whether fibromyalgia "medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment." SSR 12-2P, 2012 WL 3104869 at *6.[1] Equivalence is determined based on a comparison between the "symptoms, signs and laboratory findings" about the claimant's impairment as evidenced by the medical records "with the medical criteria shown with the listed impairment." 20 C.F.R. § 404.1526.

Petitioner asserts the ALJ failed to consider whether her impairments medically equaled a listing. In her brief, she argued the criteria for disorders of the Musculoskeletal System under Listing 1.00 were met, because her pain and other symptoms rendered her unable to ambulate effectively. During the hearing before ALJ Brennan, Petitioner argued her pain and symptoms are equivalent to the criteria for Listing 14.09, Inflammatory Arthritis. (AR 35.)

Respondent argues Petitioner has not explained how her impairments meet a specific listing, such as Listing 1.02, Major Dysfunction of a Joint, under the broad category of Listing 1.00, which encompasses several disorders of the musculoskeletal

---

[1] SSR 12-2P became effective July 25, 2012. 2012 WL 3104869.

system. Alternatively, Respondent contends Petitioner argued the criteria in Listing 14.09 were met, and she did not raise equivalence to a particular listing under Listing 1.00 before the ALJ.

The ALJ made a finding that Petitioner did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. The ALJ did not identify the listing he considered, and he provided no analysis or explanation. (AR 15.)

The ALJ's finding is insufficient to show that he actually considered equivalence. The United States Court of Appeals for the Ninth Circuit requires that, "in determining whether a claimant equals a listing under step three of the Secretary's disability evaluation process, the ALJ must explain adequately his evaluation of alternative tests and the combined effects of the impairments." *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990). In other words, "[a] boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not" meet or equal a listed impairment. *Lewis*, 236 F.3d at 512 (citing *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990)).

Applying this standard to the findings by the ALJ here, the conclusory statement that Petitioner did not equal "any" listing was insufficient. *Marcia,* 900 F.2d at 176. At the hearing level, Petitioner argued her pain and joint inflammation due to fibromyalgia symptoms was equivalent to the listing for Inflammatory Arthritis, Listing 14.09. (AR

35.)[2] Despite having done so, the ALJ did not discuss equivalency to Listing 14.09 or any other listing. It is the responsibility of the ALJ to properly consider step three equivalence. *See Marcia*, 900 F.2d at 176 (explaining that the secretary is in a better position to evaluate the medical evidence for a proper consideration of step three equivalence); *see also Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999) (wherein the medical expert thoroughly discussed the characteristics of Listing 1.03 before concluding the claimant did not meet the listed impairment).

Based upon this error, it would be appropriate for the Court to remand this matter. *Marcia*, 900 F.2d at 176. However, because other identified issues on review raise questions regarding the adequacy of the ALJ's assessment of fibromyalgia-related symptoms pursuant to SSR 12-2P, the Court will discuss these issues. *See Revels v. Berryhill*, 874 F.3d 648, 662 (9th Cir. 2017).

---

[2] Respondent appears to argue that, by not raising an argument that Petitioner's symptoms were equivalent to a listing under Section 1.00, Musculoskeletal System, either before the ALJ or in her opening brief, she did not preserve the issue on appeal before the Court. *See Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999) (holding that "appellants must raise issues at their administrative hearings in order to preserve them on appeal before this Court."). Without deciding the issue of waiver, the Court finds Petitioner did not present sufficient evidence that her symptoms prevented her from ambulating effectively, as required by 1.00B.2.b. This section requires a finding that the individual has an impairment that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities, generally without the use of a hand-held assistive device that limits the functioning of both upper extremities. The evidence in the record established Petitioner was able to drive on good days, (AR 36), she could take the bus, (AR 37), and she could take care of her activities of daily living, such as showering and dressing, albeit with difficulty, (AR 227 - 228), and that she could walk, although not without pain, (AR 227-228). Petitioner did, however, preserve the issue of listing equivalence under Listing 14.09, Inflammatory Arthritis, having raised it during the hearing before the ALJ.

**2.      Whether the ALJ Improperly Weighed the Medical Opinion Evidence**

In social security cases, there are three types of medical opinions: "those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r*, 574 F.3d 685, 692 (9th Cir. 2009) (citation omitted). "The medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also* SSR 96-2P, 1996 WL 374188, at *1 (S.S.A. July 2, 1996) (stating that a well-supported opinion by a treating source which is not inconsistent with other substantial evidence in the case record "must be given controlling weight; i.e. it must be adopted.").

ALJs generally give more weight to medical opinions from treating physicians "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations...." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Thus, the opinion of a treating source is generally given more weight than the opinion of a doctor who does not treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Should the ALJ decide not to give the treating physician's medical opinion controlling weight, the ALJ must weigh it according to factors such as the nature, extent, and length of the physician-patient relationship, the

frequency of evaluations, whether the physician's opinion is supported by and consistent with the record, and the specialization of the physician. *Trevizo*, 871 F.3d at 676; *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Although a "treating physician's opinion is entitled to 'substantial weight,'" *Bray v. Comm'r of Soc. Sec.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (citation omitted), it is "not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1195 (9th Cir. 2004). Rather, an ALJ may reject the uncontradicted opinion of a treating physician by stating "clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (citation omitted); *see also* SSR 96-2P, at *5 ("[T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). However, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

Petitioner argues the ALJ erred in evaluating the medical opinions. First,

Petitioner argues the ALJ's determination that treating physician Robert Friedman's opinion should be assigned only partial weight was not persuasively explained, given Dr. Friedman's treatment history of two years; consistent findings over time; and the physician's expertise with treating fibromyalgia. Second, Petitioner asserts the ALJ erred by discounting the opinions of Petitioner's counselor, Ashley Robinson, LCSW, who had observed Petitioner over the course of one year and wrote extensive notes regarding Petitioner's level of functioning. Third, Petitioner contends the ALJ gave contradictory reasons when weighing the opinions of treating physician Ashley Davis, and that his rationale for assigning different weight to the contradictory findings of the same provider was not logical. Last, she contends the ALJ erred because the reasons given for assigning various weights to the opinions given by state agency reviewing physicians Barney Greenspan, Myung Song, Mack Stephenson, and Michael O'Brien, were inconsistent.

Each of the opinions will be discussed below.

## A. Physician Opinions

### (1) *Dr. Robert Friedman*

Dr. Friedman treated Petitioner over the course of two years, between 2012 and 2014. Dr. Friedman is a specialist in physical medicine and rehabilitation. (AR 683.) He first saw Petitioner on December 21, 2012, as a result of a consultation request from Dr. Gail Eberharter. (AR 390.) Despite normal range of motion and no findings of weakness, Dr. Friedman noted that soft tissue examination that date revealed multiple tender spots including, but not limited to, the superior fibers of the trapezius, levator scapulae,

rhomboids, infraclavicular, biceps, triceps, wrist extensors, greater trochanter, glutei bilaterally, and gastric soleus. (AR 392.) He diagnosed fibromyalgia with greater than eleven out of eighteen tender spots and widespread pain of greater than three months duration. (AR 392.) Dr. Friedman's recommendation was for Petitioner to continue consistent gentle activity, such as walking in a pool and physical therapy to include a stretching program; medication; and consistency with sleep. (AR 393.)

At her two month follow up appointment on February 15, 2013, Petitioner reported pain in her low back, glutes, knees, hands, wrists, and ankles. (AR 389.) Dr. Friedman's physical examination noted Petitioner was not in acute distress. He diagnosed fibromyalgia as her primary diagnosis, and discussed various pain medications with her. (AR 387.) At Petitioner's next follow up appointment on August 15, 2014, Petitioner reported she had suffered a dizzy spell and had fallen down the stairs. She complained of widespread pain. (AR 584.) Dr. Friedman noted that she had diminished and painful abduction and internal rotation in her shoulders. (AR 584.)

On December 16, 2014, Dr. Friedman completed a fibromyalgia medical source statement. (AR 629.) He opined Petitioner's prognosis was fair, and described her symptoms as multiple tender points, chronic fatigue, morning stiffness, muscle weakness, numbness and tingling, anxiety, depression, and nonrestorative sleep, among others. He also described the nature, frequency, and severity of Petitioner's pain as constant and severe. (AR 630.)

Dr. Friedman completed a check-the-box assessment of Petitioner's functional

capacity. (AR 630-32.) He reported the following: Petitioner could walk one city block without rest or severe pain; she could sit for twenty minutes at a time, for a total of two hours per day; she could stand for twenty minutes at one time, for a total of one hour per day; and she could walk for less than two hours during an eight-hour work day. He indicated also that Petitioner needed to alternate between sitting and standing positions and needed to walk every sixty minutes for ten minutes each time. He reported that Petitioner could rarely lift more than ten pounds, and rarely twist, stoop, or crouch. Dr. Friedman indicated Petitioner would be capable of low stress work, may be off task fifteen percent of each work day, and may have good days and bad days. Finally, Dr. Friedman estimated Petitioner would miss work about two days per month. (AR 632.)

### (2) *Ashley Robinson, LCSW*

Ashley Robinson, a licensed clinical social worker, saw Petitioner eight times between June 17, 2014, and December 31, 2014. She addressed Petitioner's complaints of depression. Treatment notes reflect Petitioner consistently complained of depressed mood, fear, and anger due to her physical limitations (AR 675 – 681.)

On January 6, 2015, Robinson completed a mental residual functional capacity assessment. (AR 687.) Robinson noted Petitioner had marked limitations with regard to her ability to sustain an ordinary routine, maintain regular attendance, and make simple work-related decisions. Robinson noted also several other areas of marked limitation. (AR 688.) In the comments section of her assessment, Robinson explained that Petitioner has struggled to accept her physical limitations, which had led to social isolation, a sense

of worthlessness, decreased sleep, loss of energy, irritability and a strong sense of hopelessness. (AR 689.) Robinson included also her personal observations that Petitioner struggled to hold a cup, open doors, and place her coat on during cold weather. "These incidents are not contrived but due to an obvious medial need." (AR 689.)

### (3) *Ashley Davis, D.O.*

Dr. Ashley Davis, another treating provider, saw Petitioner between August of 2013 and December of 2014. Dr. Davis was Petitioner's primary care provider, and saw her for at least ten appointments during this period. During each of her appointments, Petitioner complained of chronic pain and fatigue, and sought treatment for not only her pain but also for headaches, depression, sleep disturbances, and dizziness. She consistently complained of pain in her back, shoulders, hips, knees, feet, and ankles. On October 21, 2013, Dr. Davis administered a steroid injection to alleviate pain in Petitioner's hip. (AR 615.) Petitioner reported to Dr. Davis on November 18, 2013, that she obtained some relief from her hip pain due to the steroid injection. (AR 614.) Upon examination on October 17, 2014, Dr. Davis noted Petitioner's exam was positive for back pain, joint stiffness, and myalgias. (AR 587.) During that same visit, Petitioner received a steroid injection for pain in her shoulder, at the right subacromial bursa. (AR 589.)

Dr. Davis referred Petitioner to a neurologist, Dr. James Whiteside, due to her complaints of pain. Dr. Whiteside of St. Luke's Neurology examined Petitioner on June 26, 2014, and reported to Dr. Davis that, upon musculoskeletal examination, Petitioner

exhibited tenderness at "all pressure points," and his assessment was that Petitioner "has a classic case of fibromyalgia." (AR 635.)

On November 18, 2013, Dr. Davis completed a medical report for the Idaho Department of Labor. She included her opinion that Petitioner suffered from fibromyalgia, pain, and muscle spasms. (AR 713.) She advised that Petitioner was not able to work. (AR 713.) Later, on December 5, 2014, Davis completed a Medical Assessment of Ability to do Work-Related Activities. At that time, Dr. Davis indicated that Petitioner could work eight hours in a day. (AR 625.) She reported that Petitioner complained of pain in multiple joints including hips, knees, shoulders, but had "no difficulty walking into office and standing during our appointments." She opined that Petitioner had no disability in terms of physical limitation, but that Petitioner had pain throughout her body which would limit her ability to function, and that Petitioner was overwhelmed with fatigue and pain. (AR 626, 628.)

### (4) *State Agency Physicians*

The ALJ reviewed the opinions of state agency physicians Barney Greenspan, Ph.D., Mack Stephenson, Ph.D., Myung Song, D.O., and Michael O'Brien, M.D. (AR 13, 19.) Drs. Song and O'Brien reviewed the medical records and accepted the diagnosis of fibromyalgia as causing physical limitations. Both opinioned Petitioner was capable of a range of light work. (AR 90, 76-77.)

Drs. Stephenson and Greenspan reviewed the medical records in September and October of 2013 as well, and were tasked with evaluating Petitioner's mental

impairments. (AR 14.) After a review of the record, they were of the opinion Petitioner did not have a severe mental impairment.

### B. The ALJ Erred in his Evaluation of the Physician Opinions

In determining the intensity, persistence and limiting effects of Petitioner's symptoms, the ALJ failed to provide legally sufficient reasons for rejecting the opinions of Dr. Friedman and social worker Robinson. He also erred in evaluating the opinions of treating physician Ashley Davis and the state agency reviewing physicians. These errors appear to arise from a misunderstanding of the nature of fibromyalgia and its symptoms.

Fibromyalgia is "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue." *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004). Typical symptoms include "chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue." *Id*. at 590. What is unusual about the disease is that those suffering from it have "muscle strength, sensory functions, and reflexes [that] are normal." *Rollins v. Massanari*, 261 F.3d 853, 863 (9th Cir. 2001) (Ferguson, J., dissenting) (quoting Muhammad B. Yunus, Fibromyalgia Syndrome: Blueprint for a Reliable Diagnosis, Consultant, June 1996, at 1260). "Their joints appear normal, and further musculoskeletal examination indicates no objective joint swelling." *Id*. (quoting Yunus, supra, at 1260). Indeed, "[t]here is an absence of symptoms that a lay person may ordinarily associate with joint and muscle pain." *Id*. The condition is diagnosed "entirely on the basis of the patients' reports of pain and other symptoms."

*Benecke*, 379 F.3d at 590. "[T]here are no laboratory tests to confirm the diagnosis." *Id.*

For a long time, fibromyalgia was "poorly understood within much of the medical community." *Id.* And, "[t]here used to be considerable skepticism that fibromyalgia was a real disease." *Kennedy v. Lilly Extended Disability Plan*, 856 F.3d 1136, 1137 (7th Cir. 2017). In previous decisions, the Court of Appeals for the Ninth Circuit was reluctant to recognize fibromyalgia as an impairment that could render one disabled for Social Security purposes. *Revels v. Berryhill*, 874 F.3d 648, 656–57 (9th Cir. 2017) (citing *Rollins*, 261 F.3d at 857 ("Assuming, without deciding, that fibromyalgia does constitute a qualifying 'severe impairment' under the Act ....")).

In 2012, the SSA issued a ruling recognizing fibromyalgia as a valid "basis for a finding of disability." SSR 12-2P, at *2. The ruling provides two sets of criteria for diagnosing the condition, based on the 1990 American College of Rheumatology Criteria for the Classification of Fibromyalgia and the 2010 American College of Rheumatology Preliminary Diagnostic Criteria. *Id.* Pursuant to the first set of criteria, a person suffers from fibromyalgia if: (1) she has widespread pain that has lasted at least three months (although the pain may "fluctuate in intensity and may not always be present"); (2) she has tenderness in at least eleven of eighteen specified points on her body; and (3) there is evidence that other disorders are not accounting for the pain. *Id.* at *2–3.

Pursuant to the second set of criteria, a person suffers from fibromyalgia if: (1) she has widespread pain that has lasted at least three months (although the pain may "fluctuate in intensity and may not always be present"); (2) she has experienced repeated

manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, "especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome"; and (3) there is evidence that other disorders are not accounting for the pain. *Id*. at *3.

Therefore, a diagnosis of fibromyalgia does not rely on X-rays or MRIs, or other more objective tests. Further, SSR 12-2P recognizes that the symptoms of fibromyalgia "wax and wane," and that a person may have "bad days and good days." SSR 12-2P, at *6. Consequently, the ruling warns that, after a claimant has established a diagnosis of fibromyalgia, an analysis of her RFC should consider "a longitudinal record whenever possible." *Id*.

### (1) *The ALJ Erred by Giving the Medical Opinion of Treating Physician Dr. Friedman "Partial Weight"*

Dr. Friedman treated Petitioner four times over the course of two years, and was one of Petitioner's treating physicians. He initially saw Petitioner at the request of Dr. Eberharter. (AR 390.) Dr. Friedman is board certified by the American Board of Physical Medicine and Rehabilitation. (AR 683.) His opinion concerning Petitioner's functional limitations was contradicted by the findings of Dr. Myung Song and Dr. Michael O'Brien, each of whom reviewed Petitioner's medical records in late 2013 and evaluated Petitioner's physical impairments. Thus, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence to discount Dr. Friedman's opinion. The ALJ failed to do so.

The ALJ first stated that Dr. Friedman's opinion was not supported by the Petitioner's exam findings or persuasively explained. However, the ALJ did not specify what exam findings he found insufficient. (AR 18.) Dr. Friedman's initial exam findings on December 21, 2012, were, however, consistent with a diagnosis of fibromyalgia. (AR 429 – 432.) In the consultation report provided to Dr. Eberharter on December 21, 2012, Dr. Friedman provided a detailed account of his examination of Petitioner, including Petitioner's subjective reports of pain, her longstanding history of pain, a review of her current medications, and his findings regarding her diagnosis of fibromyalgia. Upon physical examination, Dr. Friedman noted "multiple tender spots" and pain, with greater than eleven out of eighteen tender spots. (AR 431.) Dr. Friedman discussed in his report Petitioner's medical history, her repeated complaints of pain, and her response to certain prescribed medications. (AR 430, 432.) Thus, the ALJ's assignment of only partial weight on this basis is not supported by the record.

Next, the ALJ found that Dr. Friedman's opinion was not consistent with Petitioner's treatment history. Again, the ALJ provided no explanation regarding what, specifically, in Petitioner's treatment history contradicted Dr. Friedman's opinion. (AR 18.) A review of Petitioner's treatment history indicates she consistently sought treatment for widespread, chronic pain, beginning in February of 2012. (AR 483.) At her wellness examination on March 29, 2012, Petitioner complained to Dr. Eberharter that she was having severe pain in multiple joints. (AR 474.) Upon physical examination, Dr. Eberharter noted "multiple trigger points." (AR 479.) Dr. Eberharter referred Petitioner to

physical therapy, and at her appointment on June 19, 2012, Petitioner complained of pain in her hip, right ankle, and left shoulder. (AR 368.) Physical examination by the therapist that day revealed several movements that caused pain, such as shoulder abduction, shoulder flexion, and shoulder extension. (AR 369.) She was given an exercise program to do at home.

Dr. Friedman's consultative examination on December 22, 2012, was in accord with Dr. Eberharter's earlier examination. Dr. Friedman referred Petitioner also to physical therapy, where on January 7, 2013, she complained of widespread pain, having to cease activities such as skiing and hiking because of her symptoms, and difficulty sleeping. (AR 380.) Upon referral to Dr. James Whiteside, a neurologist, Petitioner again complained of widespread, diffuse pain with tenderness noted upon palpitation during her examination on June 26, 2014. (AR 633, 635.) Dr. Whiteside discussed various treatment options, which included the use of antidepressants to treat both depression and fibromyalgia. (AR 636.)

The ALJ discussed Petitioner's treatment history in the context of his credibility evaluation, concluding Petitioner's failure to seek more aggressive treatment such as trigger point injections and her relatively conservative treatment with yoga, stretching and medication, rendered her less credible. However, both Drs. Eberharter and Friedman recommended gentle activity, stretching, and physical therapy to treat Petitioner's fibromyalgia. Further, Petitioner underwent two steroid injections, one in her hip on or about October 21, 2013, (AR 615, 618), and a second in her right shoulder on October

17, 2014, (AR 589). No treating physician referred her for additional trigger point injections.

While a failure to seek treatment or follow a prescribed course of treatment can be a legitimate reason to discount a claimant's credibility, there is no authority that requires a disability claimant to affirmatively seek out aggressive treatment when no treating provider recommended she obtain such treatment. *See Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (failure to follow recommended treatment can be a basis for discounting credibility). Here, the record does not support a conclusion that Petitioner failed to follow through with prescribed treatment. Rather, the ALJ failed to give any explanation as to how Dr. Friedman's opinion was inconsistent with Petitioner's treatment history, which shows consistent complaints of widespread pain and attempts to treat the same with antidepressants, gentle physical activity, and physical therapy, which the record shows Petitioner followed.

In addition, the ALJ gave Dr. Friedman's opinion partial weight because it was inconsistent with the record as a whole. (AR 18.) Again, the ALJ provided no explanation for his conclusory statement. A review of the record as a whole, as discussed above, shows Petitioner sought treatment from multiple practitioners, consistently complained of widespread pain, and followed the recommended treatment protocols as prescribed.

Finally, the ALJ stated that Dr. Friedman's findings were inconsistent with Petitioner's own testimony about her hobby of fiber art or the bookkeeping work she did for her husband. (AR 18.) However, the ALJ did not explain this conclusion, and omitted

highly relevant qualifications to Petitioner's testimony about her fiber art hobby and bookkeeping work. With regard to her fiber art hobby, the ALJ focused on the fact that such artwork requires concentration and attendance. (AR 17.) However, Petitioner testified at the hearing that her ability to engage in fiber art has been curtailed. For instance, she bought a sewing machine which is operable with a push button, rather than a foot pedal, because her feet became too painful to operate her old machine. (AR 49.) She bought new, large handled scissors which made it easier to cut fabric with the pain in her hands. (AR 49.) She takes extended breaks, moves between stations in her art studio, and can only sustain such work for two hours at a time before having to quit. (AR 50.) Some days she is unable to engage in her hobby at all. (AR 50.)

Petitioner testified that she maintains the financial records for her husband, a contractor, by using QuickBooks. However, she testified that she was two months behind due to her inability to concentrate, (AR 61), and that she spends no more than seven hours a week at the task. (AR 62.) It is not clear how her ability to spend seven hours a week on a sporadic basis is inconsistent with Dr. Friedman's opinions regarding Petitioner's inability to sustain full-time employment for a full forty-hour work week on a regular basis. Absent any explanation, the ALJ's conclusory statement is not supported by the record as a whole.

## (2) *Ashley Robinson's Opinion was Improperly Rejected*

Ashley Robinson, LCSW, saw Petitioner eight times for individual counseling between June 17, 2014, and December 31, 2014. Robinson prepared a mental residual

functional capacity assessment on January 6, 2015. Although Robinson's opinion is not entitled to the same deference as an acceptable medical source, the ALJ erroneously afforded Robinson's opinion "little weight," and failed to provide germane reasons for doing so. (AR 18.) *See Revels v. Berryhill*, 874 F.3d 648, 665 (9th Cir. 2017) (ALJ must give germane reasons for rejecting the opinion of an "other source").

First, the ALJ stated that Robinson's opinion was not persuasively explained, without citing to specific evidence in Robinson's treatment notes or the assessment form to support this conclusion. However, a review of Robinson's treatment notes and the assessment she provided reveals Robinson provided a great deal of explanation. For instance, during counseling sessions, Petitioner consistently expressed fear, anger, and hopelessness due to her physical limitations. (AR 675 (expressing fear and anger), 676 (expressing hopelessness), 677 (grieving loss of physical ability), 679 (tearful mood), 680 (increased symptoms related to medical issues), 681 (feelings of unworthiness due to physical limitations)). And, Robinson provided a detailed explanation in support of her assessment, noting Petitioner's physical needs have become "debilitating, which has led to social isolation, sense of worthlessness, decreased sleep, loss of energy, irritability and strong sense of hopelessness." (AR 689.) It is unclear, given the detailed treatment notes and explanation in the assessment, why the ALJ found that the limitations ascribed by Robinson to Petitioner are not persuasively explained.

Next, the ALJ stated that Robinson's opinions were not supported because they were not consistent with Petitioner's hobby of fiber art or the bookkeeping work she

performed for her husband. However, as explained above, Petitioner qualified her ability to do these activities, and the ALJ failed to adequately account for these limitations.

Finally, the ALJ stated that Robinson's opinion was inconsistent with mental status exam findings and the limited mental health treatment history of Petitioner. (AR 18.) However, multiple treating providers documented and treated Petitioner's depression. For instance, Dr. Caitlin Gustafson, who assumed care of Petitioner in December of 2014 as her primary care provider, provided a statement on April 24, 2015, indicating that she concurred with the diagnosis of depression rendered by Petitioner's previous treating physicians Davis, Friedman, and Eberharter. (AR 715.) A review of Petitioner's medical records reveals a long history of treatment for depression with drug therapy: Dr. Eberharter treated Petitioner for depression with Gabapentin (AR 443, 444), Dr. Davis treated Petitioner for depression with Lexapro (AR 496, 504), Dr. Friedman diagnosed depression (AR 401) and noted she was prescribed Lexapro for the same (AR 582), and Dr. Christopher Peine[3] diagnosed depression (AR 410). Petitioner sought additional treatment in the form of individual counseling on June 17, 2014.

Thus, the ALJ's conclusion that Robinson's opinion is inconsistent with mental status exam findings and limited mental health treatment history is not supported by substantial evidence in the record as a whole. Rather, the record indicates Petitioner's

---

[3] Dr. Eberharter referred Petitioner to Christopher Peine, D.O., on September 6, 2012, for a consultation for fibromyalgia. (AR 410.) Dr. Peine examined and treated Petitioner one additional time on September 13, 2012. (AR 423.) Dr. Peine is a specialist in Osteopathic medicine, and performed osteopathic manipulation on several regions/areas during Petitioner's appointment on September 6, 2012. (AR 412.)

mental health status worsened, such that she sought additional treatment from Robinson beyond drug therapy for her depression.

### (3) *The ALJ Erred by Crediting the Later Opinion of Dr. Davis*

Dr. Davis, another of Petitioner's treating physicians, gave two opinions. The first, dated November 18, 2013, simply stated Petitioner was unable to work, and contained no supporting explanation or other description of Petitioner's physical or mental limitations. (AR 713.) The second, dated December 5, 2014, stated Petitioner could work eight hours in a day with no postural limitations. (AR 625.) The ALJ rejected the first opinion on the basis that it was not consistent with exam findings, treatment history, or Dr. Davis's later opinion. (AR 18.) However, the ALJ then gave the second opinion "partial weight" because it was "somewhat consistent with the claimant's exam findings and treatment history," but he did not give it full weight because Petitioner's treatment history suggested "some degree of physical limitation." (AR 18.)

The ALJ provided conclusory reasons for evaluating the two conflicting opinions of Dr. Davis. In light of the errors discussed above with respect to Dr. Freidman's opinion and Robinson's opinion, the ALJ must revisit his evaluation of the medical opinions of record and adequately support his rationale for providing "partial weight" to Dr. Davis's December 5, 2014 opinion, considering the medical records as a whole do not indicate Petitioner's symptoms had improved. Further, Dr. Davis's later opinion completely contradicted her earlier opinion, and the narrative in the December 5, 2014 report, in which Dr. Davis indicated Petitioner's ability to work would be impacted by

pain. Dr. Davis failed to quantify the impact Petitioner's pain may have upon Petitioner's ability to perform work, instead commenting only about Petitioner's ability to perform gross motor movements like walking, sitting, and standing, which Dr. Davis observed during brief medical appointments.

### (4) *The State Agency Physician Opinions Were Improperly Evaluated*

Drs. Greenspan and Stephenson reviewed the medical records on September 13, 2013, and October 18, 2013, evaluating Petitioner's mental impairment. (AR 14.) The ALJ gave the two opinions of these state agency psychologists great weight, because they were rendered after a thorough review of the record, and were consistent with the record as a whole. However, the ALJ's reason for accepting the opinions of Drs. Greenspan and Stephenson is error, given that neither of these physicians had the benefit of reviewing the later counseling records from Ashley Robinson, LMSW, who did not begin treating Petitioner until June of 2014. Further, additional medical evaluations and records were obtained in 2014 and 2015 from Drs. Davis, Caitlin Gustafson, and Friedman documenting Petitioner's continued complaints of and treatment for depression and worsening anxiety.

Curiously, the ALJ assigned limited weight to the opinions of Myung Song, D.O., and Michael O'Brien, M.D., for the very same reason he gave for assigning great weight to the two state agency physicians who evaluated Petitioner's mental impairments. Drs. Song and O'Brien examined the medical records on the same dates as Drs. Greenspan and Stephenson. The ALJ gave the opinions of Drs. Song and O'Brien limited weight,

because the opinions were rendered after a single review of the file performed over a year prior to the hearing, and did not encompass newer, more current, medical evidence. The ALJ cannot utilize the same reason to both accept and reject opinions suffering from the same flaw.

For the above reasons, the Court finds that the ALJ improperly evaluated the medical opinion evidence, and failed to provide specific and legitimate reasons supported by substantial evidence in the record when assigning weight and determining whether to reject or accept the opinions, as discussed above. This error is harmful and requires remand.

## 3. Credibility

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). The ALJ's findings must be supported by specific, cogent reasons. *Reddick*, 157 F.3d at 722. If a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints of pain based solely on lack of medical evidence. *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005). *See also Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (holding that an ALJ may not discredit a claimant's subjective testimony on the basis that there is no objective medical evidence that supports the testimony).

The ALJ must first determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the

pain or other symptoms alleged. *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014). The claimant is not required to show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom. *Id.* Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof.

If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. *Burch*, 400 F.3d at 680. This is not an easy requirement to meet---the clear and convincing standard is the most demanding required in Social Security cases. *Garrison*, 759 F.3d at 1014–15 (citations omitted) (internal quotation marks omitted).

In evaluating credibility, the ALJ may engage in ordinary techniques, including considering claimant's reputation for truthfulness and inconsistencies in claimant's testimony, or between claimant's testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties concerning the nature, severity and effect of the symptoms of which claimant complains. *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). Also, the ALJ may consider the location, duration and frequency of symptoms; factors that precipitate and aggravate those symptoms; the amount and side effects of medications; and treatment measures taken by the claimant to alleviate those symptoms. *See* Soc. Sec. Ruling 96-7p.

Petitioner testified at length during the hearing before the ALJ about her

symptoms and functional limitations. She completed two function reports, one on August 26, 2013, and a second on October 17, 2013, and provided a pain journal which covered the period from March 1, 2012, to November 18, 2014. (AR 226, 267, 289 - 333.) Petitioner submitted also a third-party function report from her husband, as well as numerous lay witness reports from friends and family. (AR 240, 338 – 353.)

The ALJ first found that Petitioner's testimony concerning the effects of her fibromyalgia pain was undercut, because objective findings did not support her claims of severe pain. (AR 16.) For instance, the ALJ noted that several examinations revealed normal gait, normal strength, normal sensation, and functional range of motion of the extremities. (AR 16.) He also cited medical records that indicated her symptoms varied. (AR 16.) The ALJ's reasoning is erroneous.

The ALJ may not rely upon the lack of objective evidence, such as normal neurological exams and normal cognitive testing in this case, when the record reveals a long history of Petitioner's complaints of diffuse pain and fatigue reported over time to multiple medical providers. (AR 17- 18.) Objective tests are administered to rule out other diseases and alternative explanations for the pain but do not establish the presence or absence of fibromyalgia, as fibromyalgia cannot be objectively proven. *Tully v. Colvin*, 943 F. Supp. 2d 1157, 1165 (E.D. Wash. 2013). Here, Petitioner's fibromyalgia diagnosis was undisputed. Petitioner's treating physicians, Drs. Davis and Eberharter, as well as the various other medical professionals who treated or examined Plaintiff, such as Drs.

Friedman, Peine, Whiteside, and Gustafson,[4] acknowledged she had fibromyalgia. Petitioner underwent neurological testing and two consultative examinations by Drs. Friedman and Peine to rule out other causes for her symptoms. She had a brain MRI and a cerebral MRA as well, which revealed no abnormalities. (AR 633.)

The examination results cited by the ALJ are consistent with debilitating fibromyalgia. *See Revels*, 874 F.3d at 666. Fibromyalgia is diagnosed entirely on the basis of a patient's reports of pain and other symptoms, and there are no laboratory tests to confirm the diagnosis. *Benecke*, 379 F.3d at 590. Further, a person with fibromyalgia may have muscle strength, sensory functions, and reflexes that are essentially normal. *Rollins*, 261 F.3d at 863.

Next, the ALJ found Petitioner's allegations of disabling pain were not consistent with her treatment history. He cited her utilization of a variety of home treatment modalities, and the fact she had not sought out more aggressive treatment such as trigger point injections, to discredit Petitioner's testimony. The ALJ concluded that, "while the claimant's treatment history is consistent with some degree of symptomology, it is not consistent with the claimant's allegations of disabling symptomology." (AR 17.) The ALJ did not, however, cite to any medical records, nor did he note the longitudinal history of complaints Petitioner made to multiple medical providers about widespread, diffuse, and debilitating pain. And, as discussed above, while the failure to follow

---

[4] Notably, the ALJ failed to discuss the records pertaining to Dr. Peine's and Dr. Gustafson's care and treatment of Petitioner.

prescribed treatment can be a reason to discredit Petitioner, a failure to seek out more aggressive treatment when such was not prescribed is not a reason to do so. Petitioner's treating physicians prescribed both drug therapy and gentle activity to treat her pain, which advice Petitioner followed.

Moreover, any evaluation of the aggressiveness of a treatment regimen must consider the condition being treated. *Revels*, 874 F.3d at 667. Petitioner did receive two injections, one in her shoulder and another in her hip. She was prescribed a variety of medications for her pain, including Gabapentin, Trazodone, Escitalopram (Lexapro), Zolpidem (Ambien), Sumatriptan Succinate (Imitrex), and Meloxicam (Mobic). (AR 334 – 337.) The ALJ provided no explanation for why he deemed this treatment "conservative" for fibromyalgia.

Third, the ALJ determined Petitioner's credibility was undercut based upon the level of her daily activities. Although Petitioner testified to very limited activities, the ALJ determined that her daily activities could not be objectively verified. This is not a legitimate reason for rejecting Petitioner's credibility, because there is no way to objectively verify activities other than a review of the record. Here, the record contained ample evidence regarding Petitioner's activities from her husband and third parties. For instance, her husband stated Petitioner used to hike, snow ski, ride a bike, mow the lawn and chop wood, but that she no longer does these activities due to pain. (AR 241.) Her close friend, Claire Remsberg, noted that, over time, Petitioner has decreased her activities and no longer participates in community events and outdoor pursuits. (AR 339-

40.) Her hiking partner, Brigid Lawrence, noted the same, explaining that they no longer hike together. (AR 344.) Petitioner has not reported anything inconsistent to her care providers, and testified she decided to stop working for the Donnelly City Council due to her medical condition. (AR 44, 338.) Petitioner has repeatedly and consistently described the severe and increasing limitations on her ability to complete daily activities.

Fourth, the ALJ stated, without explanation, that it was difficult to attribute such a severe degree of limitation to Petitioner's medical condition, "as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision." The ALJ failed to elaborate on what these other factors were, nor did he explain why the medical evidence was weak. Rather, it appears this conclusion stems from a misunderstanding of fibromyalgia, as discussed above when analyzing Dr. Friedman's opinion.

Fifth, the ALJ determined that Petitioner's teaching activity, bookkeeping work for her husband, and her fiber art hobby "suggest a far greater ability to sustain concentration and attendance than the degree of pain alleged by the claimant would suggest." However, as discussed previously, Petitioner performed bookkeeping work for her husband at most seven hours each week, and was able to engage in her art hobby for up to two hours only when feeling able. Petitioner testified she applied for substitute teaching work, but was unable to follow through when she was called to work. (AR 60-61.) The art class she taught required only one to two hours per week. (AR 39.) The ALJ's reason does not consider Petitioner's subjective complaints of pain, which were

well documented in the medical records provided, nor the qualifications on Petitioner's activities, to which the Petitioner testified.

And finally, the ALJ relied upon a statement made by Petitioner to one of her physicians in February of 2014, that "she would not take [narcotics] even if they were effective because if they did work, I would need to start looking for work, and right now, I'm not even considering going back to work." (AR 17.) The ALJ explained that this statement, in his opinion, undercut Petitioner's credibility, because it suggested she was not motivated to return to work. It is unclear, however, how one statement against a backdrop of sustained full-time work history until she reached a point where her pain precluded it (AR 166- 171) weakens Petitioner's credibility. Moreover, no physician prescribed narcotic pain medication throughout the course of her treatment history. And last, Dr. Caitlin Gustafson, who assumed Petitioner's care in December of 2014, provided a statement that she concurred with previous medical opinions that "it is not in the patient's best interest to treat these conditions with other pain relieving therapies such as chronic narcotics." (AR 715.) The ALJ failed to note Dr. Gustafson's opinion, take it into account when assessing Petitioner's statement made in February of 2014.

Based upon the above, the ALJ failed to provide clear and convincing reasons, supported by substantial evidence, for rejecting Petitioner's testimony about the severity of her symptoms.

### 4. Lay Witness Testimony

Petitioner submitted third party statements from Kenneth Minshall, a member of the Donnelly City Council, for whom Petitioner previously worked; Claire Remsburg, a friend of eight years; Mary Belecz and Susan Duncan, Petitioner's sisters; Martha Osborn, Petitioner's aunt; Brigid Lawrence, Petitioner's friend of ten years; Renee Silvus, a friend of eight years; Scott Clinger, Petitioner's husband; Ann Nies, Petitioner's yoga instructor; and Ana Demetraides, Petitioner's daughter. (AR 18.) To reject third-party reports of Petitioner's impairments, an ALJ need only "give reasons that are germane to each witness." *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012); *see also* 20 C.F.R. § 404.1529(c)(3).

The reasons the ALJ gave for rejecting the third party statements are not germane to any of the witnesses. The ALJ rejected the statements because, as friends and family, the individuals are expected to be sympathetic; none of them has training to qualify them to determine whether Petitioner's limitations are due to her impairment versus other factors; and some, like her husband, have a financial interest in a favorable adjudication of Petitioner's application for disability benefits. These are not valid reasons to reject competent lay witness testimony. *Valentine v. Comm'r Soc. Sec. Admin*., 574 F.3d 685, 694 (9th Cir. 2009) ("regardless of whether they are interested parties, 'friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to [his or] her condition.'") (quoting *Dodrill v. Shalala*, 12 F.3d

915, 918 (9th Cir. 1993)).

As for the ALJ's final reason for rejecting the lay testimony, he stated that the witnesses' observations were inconsistent with Petitioner's ability to sustain part time work activity (bookkeeping), her fiber art hobby, her ability to teach an art class, and her statement that she does not want to return to work. (AR 19.) These are the same reasons discussed above with regard to the ALJ's evaluation of Petitioner's credibility. If an ALJ provides reasons for rejecting Petitioner's testimony regarding her symptoms that are equally relevant to the similar testimony of the lay witnesses, that would support a finding that the lay testimony was similarly not credible. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). Here, however, the Court finds that the reasons given for rejecting Petitioner's credibility regarding the intensity, persistence, and severity of her pain were not clear and convincing reasons supported by substantial evidence in the record. It follows, therefore, that the ALJ cannot use the same reasons to support his rejection of the lay witness testimony.

## 5. Remand or Reversal

Petitioner asserts that the Court should reverse and remand for an award of benefits, rather than remand this matter for further proceedings. Respondent argues remand is appropriate if the Court finds error. Remand for further administrative proceedings is proper if enhancement of the record would be useful. *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004). Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district

court should remand for an immediate award of benefits. *Id.* (citing *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir.1996)).

Specifically, the Court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits, if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id.* The Court should not remand solely to allow the ALJ to make specific findings regarding excessive pain testimony. *Id.* Rather, the Court should take the relevant testimony to be established as true and remand for an award of benefits. *Id.*

Here, the ALJ failed to provide legally sufficient reasons for his findings at step three and at step four. However, even giving the opinions of Dr. Friedman and Ashley Robinson, LCSW, the consideration to which they are entitled, it would be inappropriate for the Court to conclude Petitioner is entitled to benefits as a matter of law. There is no clear testimony from the vocational expert that the limitations found by Dr. Friedman or Ashley Robinson would render Petitioner unable to engage in any work. The ALJ did not ask the vocational expert at the hearing whether, given Dr. Friedman's and Ashley Robinson's assessment and Petitioner's testimony about her pain, she would be unable to

engage in any work. (*See* AR 65-67.)[5] Rather, the testimony regarding work other than her past relevant work was somewhat equivocal.

Petitioner's past relevant work in a skilled, sedentary position allowed for some flexibility with absenteeism, sit/stand options, and other accommodations. (AR 66-67.) The vocational expert was asked only whether additional limitations, such as a limitation to performing routine tasks, or the inability to look at a computer screen, would preclude Petitioner's past work. (AR 64-67.) The vocational expert testified that such limitations would preclude Petitioner's past relevant work. The vocational expert was not asked about all work at step five. And, the ALJ failed to continue to step five of the sequential process in his written opinion. Thus, it is unclear whether, if given additional limitations, a vocational expert would opine that Petitioner would be precluded from all work at step five.

Accordingly, the proper course is to remand for further proceedings. *Harmen v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000) ("[W]here the testimony of the vocational expert has failed to address a claimant's limitations as established by improperly discredited evidence, we consistently have remanded for further proceedings rather than payment of benefits.").

---

[5] The ALJ aksed the vocational expert if Petitioner could perform sedentary work. (AR 64-65.) Petitioner's counsel questioned the vocational expert about Petitioner's ability to perform her prior work. (AR 65-67.) However, it is not clear to the Court whether, if Dr. Friedman's and Ashley Robinson's opinions were credited, Petitioner would be precluded from all work. Petitioner did not provide analysis to accompany her assertion that remand for an award of benefits was proper based upon the evidence in the record or the testimony at the hearing.

**MEMORANDUM DECISION AND ORDER - 39**

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Plaintiff's Petition for Review (Dkt. 1) is **GRANTED**.

2)      This action shall be **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

3)      This Remand shall be considered a "sentence four remand," consistent with 42 U.S.C. § 405(g) and *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).

DATED: March 4, 2019

Honorable Candy W. Dale
United States Magistrate Judge